JOHN T. STODDERT AND ROBERT
BOWIE, JR. AND WIFE,
vs.
WM. H. TUCK, EXECUTOR OF
ROBERT BOWIE AND OTHERS.

SEPTEMBER TERM, 1851.

[ANTE-NUPTIAL SETTLEMENT—PART PERFORMANCE.]

To establish, in opposition to the plea of the statue of frauds, an ante-nuptial agreement between the parents of the parties about to be married, that one was to furnish land, and the other personal property, to start the married couple in life, the proof must be clear and positive of a contract certain and concluded.

Where acts of part performance are relied on to establish such an agreement, they should be such as in themselves, not only show that there has been an agreement, but also throw light upon the nature of that agreement ; if the acts performed are equivocal acts, they will afford no proof of an agreement.

[The bill in this case was filed by the complainants, John T. Stoddert and Robert Bowie, Jr., and Elizabeth, his wife, against the personal representatives, widow and devisees of Robert Bowie, deceased, for the specific performance of an alleged agreement made between the said Robert Bowie, deceased, and the complainant, John T. Stoddert, in contemplation of the marriage of their children, the other complainants. The allegations of the bill and answer, and the proof in the case are sufficiently stated in the following opinion of the *Hon. Nicholas Brewer*, Associate Judge of the third Judicial District, to whom the cause was certified by the Chancellor, who was interested in the result of the suit.]

This case has been submitted to me by certificate of his honor, the Chancellor, and has been fully argued on both sides.

The bill in substance alleges, that the complainant, Robert W. Bowie, Jr., and Elizabeth Bowie, then Elizabeth Stoddert, being engaged to be married, with consent of their parents, John T. Stoddert and Robert W. Bowie, and having no means for their support and maintenance when married, in contemplation of the said marriage, it was thereupon mutually agreed by and between their parents, and also by and between their said parents and themselves, and as a provision therefor, that the said John T. Stoddert should give to his said daughter a farm, not to exceed the value of $12,000, and that the said Robert W. Bowie should give to his said son, as soon as he was married, $8000 or $10,000, in personal property, suitable for the occupation and cultivation of a farm, and in addition thereto, if the married couple should be settled near him, should furnish them with groceries and other necessary supplies for a year or more, until a crop was made to obviate the necessity of their going in debt. That on the 28th day of May, 1846, upon the faith of said agreement, and relying thereon, the said parties were married.

The bill further states, that the said John T. Stoddert, in fulfilment of *his part* of the said agreement, purchased the Nottingham farm, in Prince Georges county, at the cost (including

repairs) of $10,550, and put the said parties in possession thereof, under the said agreement, and gave them personal property to the amount of $1450, though he has executed no deed to the said daughter for the said farm, but being a complainant in the bill, offers to submit to a decree to that effect, insisting on a contemporaneous execution on the part of the said Robert W. Bowie, of his part of said agreement. That the said farm was purchased, not only with the concurrence but at the suggestion of the said Robert W. Bowie, made on the eve of the said marriage, and at that time the house thereon was furnished by the said Robert W. Bowie with as much furniture as he thought the said married couple would need, and the farm itself supplied to some extent with necessary utensils. That the said Robert W. Bowie had also, prior to the said marriage, and afterwards, put some slaves, &c., upon the farm, in part performance of his said agreement.

The answer of Robert W. Bowie's personal representatives, admits the marriage, but no part of the alleged agreement, and pleads the statute of frauds. It is, therefore, requisite that the agreement should be established by proof, and shown either to have been in writing, signed by the parties in pursuance of the statute of frauds, or to have been taken out of the statute by such acts as have been deemed by courts of equity sufficient for that purpose.

There is no proof of any formal agreement signed by the parties, and it was admitted by the complainants' counsel in the argument, that there was no written agreement by which the defendants' testator could be bound, unless an agreement might be inferred from the contents of three letters in the testator's hand-writing, addressed to the said John T. Stoddert, and in proof in the cause, and that a concluded agreement could be inferred from them, was not pressed upon the court.

The first inquiry is, is there any, and what, agreement proved in the cause between the parents and the couple about to be married, on the faith of which the matrimonial contract was entered into? I can find no proof whatever, of a contract between

the parents and their children, and, therefore, dismiss at once the consideration of that matter.

The first evidence relied upon to establish the contract between Stoddert and the elder Bowie, is the three letters before referred to, from the latter to the former. The first dated December 13th, 1845, informs Mr. Stoddert of the communication to the writer, by his son, of the engagement between him and Stoddert's daughter, and Stoddert's willingness to settle real estate upon her, proposes to Stoddert the purchase of the "Nottingham Farm" for that purpose, and states his own ability to give Robert some eight or ten thousand dollars in personal property, without which he considers a farm of little value. The second letter, dated 31st of December, 1845, speaks of a communication made to him by his son of Stoddert's desire for a personal conference with him on the subject of the contemplated settlement, and proposes that Stoddert should meet him in Washington, on the 9th of the then ensuing month, (January) and says, that he sees no reason to apprehend that any difficulty can arise to interrupt the early settlement of this matter. So far there is certainly no proof of a concluded agreement, but of an incipient treaty only, in which there are some suggestions of the disposition of the parties in reference to the terms of the agreement, and propositions agreed to for a personal conference on the subject. The next proof is found in the testimony of Mr. R. Johnson, who sees Robert W. Bowie in Baltimore, on his way to the proposed conference at Washington, and by whom he is told of the engagement, and of the dependence of its completion on the result of this conference. As to what passed between the parties to it we have very little information. No writing has been produced containing its result, and no direct evidence has been adduced of what was proposed or what acceded to by either of the parties. Next comes the third letter, of the 27th of May, one day before the marriage, in which the writer regrets his inability to be present at the nuptials, informs Mr. Stoddert of the completion of his purchase of the "Nottingham Farm," and says further, that "regarding your conversations in our last interview at Washington

expressing your desire to take the purchase off my hands, I have only to say, that I am quite willing to let you have it at cost. The house is very comfortably fitted up, with quite as much furniture as young beginners ought to have." In this letter, I see no evidence either of a concluded contract or of any definite terms of a contract proposed or concluded, and there is no other reference to be found in any part of the testimony to this conference at Washington.

A few days after the marriage, Mr. Bowie being at Stoddert's, in consequence of the illness of one of his daughters, and Dr. Macubbin being present attending as a physician, the latter testifies to a conversation which then took place between them. Bowie pressed Stoddert to purchase the "Nottingham Farm" for his daughter, saying that if he would do so, he himself would furnish his son Robert with personal property to the amount of ten thousand dollars, the object of the two being to start the young couple in life. He also recollects hearing Stoddert say that Bowie and himself would furnish them with a very pretty start. Bowie also said, that he would furnish his said son and wife with necessaries for the first year after their marriage, to prevent them from anticipating their crops. This is all very vague, and seems to be rather propositions and expressions of intentions at that time than references to a positive agreement entered into at an antecedent period. If any contract then, between Bowie and Stoddert is to be found in this case, we must look for the evidence of its terms solely in the admissions of Bowie in his conversations with the different witnesses. And first, Dr. Maccubbin says, that prior to the marriage, Bowie stated to him in conversation, "that Stoddert exacted as a preliminary condition to the marriage that Robert W. Bowie, Jr., should be relieved from debt, and that he, Robert W. Bowie, would place him in that condition by the payment or assumption of all his liabilities." Whether Robert W. Bowie had submitted to this exaction, and whether it constituted a part of the contract does not appear.

Thomas F. Bowie says, that Robert W. Bowie consulted him with reference to this alleged agreement, and told him, the

witness, of his, Bowie's, understanding of the agreement or
marriage settlement with Stoddert, upon the intermariage of
the complainants, Robert and Elizabeth, which was, that "he
had agreed with Major Stoddert, to give his said son Robert
from six to ten thousand dollars, and asked witness whether he
had not the option to give the lowest sum, Major Stoddert
claiming the larger amount." Robert Bowie deposes that he
had always understood from his uncle, Robert W. Bowie, in
conversations before and after the marriage, "that he and Ma-
jor Stoddert had agreed to set up their said children in life free
and unincumbered, and to support them for twelve months until
they made a crop; that before the marriage, various proposi-
tions were made for the purchase of farms of different values,
and finally, before the marriage, Robert W. Bowie informed
witness, that he had proposed to Major Stoddert the purchase of
the "Nottingham Farm," and that it met Major Stoddert's views
as to the value of a farm proper for them. He had repeated
conversations with Robert W. Bowie after the marriage, in
which he complained that Major Stoddert had not complied
with his part of the contract, by deeding the property to his
daughter, while he considered himself as having nearly per-
formed his part of it. But his, Robert W. Bowie's views on
that subject as to the extent of the provision he was to make
were not as great after the marriage as they had been before
it. Robert W. Bowie never denied that he made such con-
tract."

Here is a contract sought to be established for a large amount,
on an occasion important to the parties, of which there is no
particle in writing, nor any evidence of a contract solemnly en-
tered into by parol before witnesses, and is to be established
by the loose admissions of one of the parties alone, made at
different times to different witnesses, which do not agree with
one another, nor possess that certainty and mutuality which should
pertain to every contract. Robert W. Bowie admits before and
after the marriage to Robert Bowie, or as the latter says, "never
denied that he had made a contract," but when and where, and
on what terms was it made? Stoddert was to furnish land, and

Bowie an equivalent in personal property. But to what amount was land to be furnished? Bowie says that he had proposed to Stoddert the purchase of the "Nottingham Farm," and that it met Stoddert's views as to the value of a farm proper for them, the married couple, not that Stoddert had agreed to purchase it and convey it to his daughter. But afterwards he complained that Stoddert had not conveyed it in compliance with his part of the contract. His, Bowie's, part of the contract with which he thinks he had in a great part complied, is not now an equivalent, but less than before the marriage, how much less we are not informed. Thomas F. Bowie is the only witness to these admissions, who speaks with certainty as to the amount of Robert W. Bowie's obligations. Robert W. Bowie tells him they were from six to ten thousand dollars, but says nothing of Stoddert's obligations. What certain contract can be inferred from admissions so varying and so imperfect as they are? Some were made before, and some after the marriage, and we have to look to both for the contract, but when we look to the testimony of Dr. Maccubbin as to the conversation between Bowie and Stoddert just after the marriage, we find that nothing was then settled. Bowie urged the purchase of the "Nottingham Farm," by Stoddert, and promised to give $10,000 in personal property, if Stoddert would purchase that farm for his daughter. Stoddert afterwards purchased the "Nottingham Estate," but was careful not to convey it to his daughter. Bowie took away and sold part of the property that was put upon the "Nottingham Farm," and we do not hear of anything further passing between the parties on that subject.

On the whole, the evidence is conclusive to my mind, that Stoddert and Bowie were both desirous of providing for the newly married couple, intending to do so, and were in treaty as to the amounts to be respectively contributed, but never 'came to any definite and conclusive arrangement. That though he used the term contract, Robert W. Bowie's admission evidently referred to those propositions and negotiations in which the views and intentions of the parties were spoken of, and which he no doubt thought at that time ought to be carried out, and

40*

Stoddert, by the purchase of the farm, placed himself in a situation to comply with the agreement when it should be completed, but there is no proof that he ever incurred the obligation to convey it to his daughter.

Being of opinion that no certain contract is established in this case, it is unnecessary to examine very critically the point that there is no part performance to take the case out of the Statute of Frauds. I will, however, make a very few remarks upon it. It is laid down in the books that the act performed should in itself tend to show not only that there has been an agreement, but also to throw light on the nature of that agreement, so that neither the fact of an agreement, or even the nature of that agreement, rests solely upon parol evidence, the parol evidence being only auxiliary to the internal evidence afforded by the circumstances of the case itself. If, however, the act performed is an equivocal act, it will afford no proof of an agreement. *Atherly on Marriage Settlements*, 89. Suppose, then, that the contract alleged had been proved to have been entered into some short time preceding the marriage, what are the facts relied on as part performance on the part of Robert W. Bowie? It is said that the house was furnished, and stock put upon the farm to work it, and the parties put in possession of the farm, stock and furniture. Laying aside the admissions of Robert W. Bowie, that these acts were in part performance of his contract, because that must be shown by the nature of the acts themselves, are they unequivocal? Might they not, and would they not, have been done in all probability if no marriage contract had existed? His son being about to be married, and having no residence of his own, his father furnishes a house on one of his farms near his residence, puts some more stock on it, and permits him to live there, work it, and receive the proceeds of his labor, he, the father, being or supposing himself to be a wealthy man. This would naturally have been done if there had been no agreement, or only a treaty for an agreement. The supposed agreement was, that Stoddert should furnish the land, and he would furnish the stock to work it. Stoddert had as yet furnished no land. He put the parties in

possession of none. He was in treaty for this land, but did not purchase it until some months afterwards. If the land had been Stoddert's, and he had put the married couple in possession of it, then the act of putting personal property upon it might have been considered in part performance. If he had declined the purchase, and had bought other land, and put them in possession, and Bowie had then put the property on it, it might have been so considered, because the act could not well have been referrible to any other intention. But the married couple are enforcing this agreement against both parents. Stoddert does not resist, but it must be shown to bind Bowie, that he, Stoddert, was bound as well, and to show this, part performance must be proved against him. And what was this part performance? Merely permitting the occupant to remain there for little more than a year before the death of Bowie, Bowie taking and selling as his own the property put upon the land, and Stoddert taking the deed to himself instead of his daughter. It seems to me very clear that there was no part performance by either of the contracting parties. The case of *Dugan and others* vs. *Gittings and others*, 3 *Gill & Johns.*, 157, is not a parallel case to this. There the gift was made to the daughter about to be married. The consummation of the marriage was considered the fulfilment of the condition which it was to attach, and was considered as equivalent to the payment of the purchase money in a pecuniary contract. The pecuniary contract was fully performed by the one party, and partly performed by the other.

Entertaining this opinion, I must dismiss the bill.

---

[An appeal was taken from the decree dismissing the bill, and this decree was affirmed by the Court of Appeals, at its December term, 1853.]

---

R. JOHNSON and J. M. CAMPBELL, for Complainants.
THOS. G. PRATT and THOS. S. ALEXANDER, for Defendants.